# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

—————————————————

MARK ROBINSON     :
            :
   Plaintiff     :
            :
  v.        :  Case No. <u>15-cv-444 (RC)</u>
            :
DISTRICT OF COLUMBIA   :
            :
   Defendant    :

—————————————————

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS OPPOSITION TO SUMMARY JUDGMENT

### I. Introduction.

The Plaintiff has legally sufficient evidence that he suffered an adverse action caused by unlawful discrimination and retaliation prohibited by Title VII of the Civil Rights Act of 1964 codified at 42 U.S.C. § 2000e-2 et seq. ("Title VII") and the District of Columbia Human Rights Act, D.C.Code § 2-1402 (2001).  The loss of voluntary overtime opportunities is an adverse action under Title VII and the facts in support of those lost wages are genuinely disputed.  The Defendant's asserted non-discriminatory reason for excluding the Plaintiff from overtime opportunities has changed over time, thereby leading to the inference that the explanation is pretextual. Consequently, the

Plaintiff is entitled to have a jury resolve his factual allegations and claims for relief.[1]

The Plaintiff, who is a black Sergeant, contends that he was denied the opportunity to work overtime by a white supervisor who (1) chose a less qualified white Sergeant (Thorne) over the Plaintiff to work within the ATEU where he was eligible for overtime opportunities, (2) chose a second white Sergeant (Blakely) to work ATEU overtime while excluding the Plaintiff on a basis that would also necessarily exclude the second white Sergeant, and (3) excluded the Plaintiff from working ATEU overtime while selecting all other overtime participants who had not complained about unlawful discrimination through a lottery system.

## II.  Factual Summary:

The following record facts demonstrate that there are genuine disputes of material facts and that the jury could reasonably infer unlawful discriminatory intent from the context of those facts.  See, also, "Plaintiff's Concise Statement of Genuine Issues of Material Facts" filed contemporaneously with these Points and Authorities pursuant to LcvR 7(h)(1).

---

[1] The Plaintiff has alleged that he was unlawfully discriminated against when the Defendant denied his requests beginning in 2014 to be reinstated to the ATEU ***and*** when the Defendant refused to let the Plaintiff work overtime opportunities in the ATEU, *Compl. at Para. 15-18,* and that those adverse actions caused the Plaintiff to lose wages.  *Compl. at Para. 19-21.* Overtime opportunities in the ATEU is the core issue in this case, whether the Plaintiff was working within or outside the ATEU, although the Defendant only moved for summary judgment on the Defendant's decision refusing to reinstate him to the ATEU on a full-time basis.

### A.  General Background.[2]

The Plaintiff was a sworn law enforcement officer of the Fairfax County Police Department when he was hired by MPD in April 1990.  At that time, the Plaintiff was already certified in the use of radar speed measurement devices.  See, *EXHIBIT No. 1, Paragraphs 1-3*.

The Plaintiff focused his law enforcement career on traffic safety.  *EX. 1, Para. 4.* The Plaintiff earned numerous certifications related to accident reconstruction, speed measuring devices, and enforcement of drunk driving laws.  *EX. 2.*  Between 1991 and 2004, the Plaintiff became a certified operator ***and instructor*** in all speed measuring devices used by MPD.  *EX. 1, Paragraphs 5, 6, 9, and 10.*

In 1996, the District of Columbia passed legislation authorizing MPD to utilize photo enforcement devices to detect moving violations.  *EX. 1, Para. 7* and *EX. 2 = General Order POP 303.10, Sec. I - Background.*  In 1998, MPD contracted with Affiliated Computer Services ("ACS") as the vendor for MPD's photo traffic enforcement devices.  *EX. 1, Para. 8.*  As a result, Chief Lanier issued the original version of General Order OPS 303.10, entitled, Automated Traffic Enforcement Program ("ATEP"). *EX. 1, Para. 8.*  In 2006, MPD selected a different vendor for its automated

---

[2] All Exhibits referred to the Plaintiff's attached exhibits unless specifically identifying one of the Defendant's exhibits attached to its Motion for Summary Judgment.

Exhibit numbers referring to deposition testimony will either specify multiple pages or include a page number followed by the line numbers on that same page  For example, 29-30 refers to pages 29 and 30 while a reference to 66:7-18 specifies page 66 from lines 7 to 18.

traffic enforcement devices. *EX. 1, Para. 11.*  The Plaintiff was certified in the operation of equipment supplied by MPD's vendors over the years. *EX. 1, Para. 8, 9 and 10.*

The ATEP was operated exclusively as an overtime unit of sworn MPD members who were certified to deploy traffic enforcement devices and volunteered to work within the ATEU. *EX. 1, Para. 13* and *EX. 3 at pages 1-2.*  Sworn MPD members were also used to review potential violations and approve for issuance Notices of Infractions to motorists.  *EX. 3, page 2.*  The Plaintiff's expertise was utilized by MPD (with Sgt. Sharion Garner) to develop ATEU enforcement programs and to draft revisions to the General Order governing the ATEU, known as G.O. OPS 303.10, in order to keep up with the newest traffic enforcement devices utilized by MPD. *EX. 1, Para. 13*; *EX. 4 at 18:7-12*; and *EX. 5 at 48:14-17.*  The Plaintiff and Sgt. Garner also drafted lesson plans and trained all of the MPD officers who thereby received certification in the use of MPD's traffic enforcement devices.  *EX. 1, Para. 13 and 14.*

In 2006, MPD replaced ACS as the vendor by contracting with American Traffic Solutions ("ATS") for traffic enforcement devices. *EX. 1, Para. 11.*  In the late 2000's, MPD had deployed traffic enforcement technology using fixed, stationary, and mobile devices. *EX. 1, Para. 7.*  Civilian technicians working for ATS started reviewing films and data to identify violating motorists but sworn MPD members were still required to approve the issuance of all Notices of Infraction.  *EX. 1, Para. 11.*  For several years through 2010, the Plaintiff clocked approximately 1500 ATEU overtime hours per year.

*EX. 1, Para. 30.*  On April 13, 2018, the Plaintiff was formally assigned to the ATEU on a full-time basis.  *EX. 1, Para. 12.*

In 2008, MPD announced that is was accepting new volunteers to become certified operators of automated traffic enforcement devices.  *EX. 1, Para. 15* and *EX. 5, pages 26-27* [3] and *62-63.*  Newly certified operators would become eligible to work overtime opportunities in the ATEU.  *EX. 1, Para. 15* and *EX. 5 at 62-63.*  MPD received 855 volunteers seeking to work in the lucrative ATEU overtime program. *EX. 1, Para. 15* and *EX. 5 at 62-63.*  MPD reduced the volunteer list of 855 members down to 213 candidates through a lottery system.  *EX. 1, Para. 15* and *EX. 5 at 62-63.*  From 2008-2010, those 213 candidates were trained and certified in the operation of automated traffic enforcement devices by the Plaintiff and Sgt. Garner, both of whom drafted the lesson plans and manuals used by those trainees.  *EX. 1, Para. 14-15.*

The Plaintiff and Sgt. Garner issued and signed all of the certifications for those 213 candidates to render them eligible to work ATEU overtime opportunities.  *EX. 1, Para. 14-15.*  As MPD's certified instructors, the Plaintiff and Sgt. Garner were not required to enter the lottery to participate in the ATEU overtime program.  *EX. 1, Para. 16.*  We were already certified operators and G.O. OPS 303.10 Sec. A V allowed certified instructors to demonstrate proficiency to operate devices without undergoing three "ride-

---

[3] Defendant's designee, Ms. Molovsky, referred to this event as occurring in 2010 whereas the Plaintiff describes this process of selecting and training a new group of sworn members for the ATEU overtime program as commencing in 2008 and culminating in 2010.

alongs" required for ordinary operators who had not deployed devices for 12 months. *EX. 1, Para. 16 and 28.*

In 2010, the Plaintiff and Sgt. Garner drafted revisions to G.O. OPS 303.10 procedures for the certification of ATEU operators. *EX. 1, Para. 13.* The Plaintiff and Sgt. Garner worked under the supervision of Lisa Sutter, a white woman, and Commander Sund, a white man. *EX. 1, Para. 13.* Chief Lanier approved those revisions and published G.O. OPS 303.10 bearing an effective date of October 1, 2010. *EX. 3 and EX. 1, Para. 13.* The 2010 version restated the operating structure of the ATEU as an overtime program utilizing sworn officers reviewing violations and approving the issuance of all Notices of Infractions:

> The ATE Program utilizes sworn Metropolitan Police Department members who have been certified through training to set up, test and operate the software and hardware that is installed both in the vehicles and in the fixed apparatus, to ensure that violations that are captured can be processed as Notices of Infraction (NOIs). These members receive compensation for a duty assignment that is outside of their regular assigned duties and responsibilities and tour of duty, in accordance with MPD regulations.
>
> It is imperative that the program be staffed by trained, experienced personnel who fully comply with the regulations required to issue valid NOIs. The program uses lieutenants and sergeants who have been certified through training to supervise the mobile deployments. The program utilizes lieutenants, sergeants and officers who have been certified through training to monitor and operate the mobile and fixed instruments to ensure that violations that are captured can be processed as NOIs.
>
> The program uses sworn officers as violation review officers to review potential violations to determine the validity thereof, and to approve for issuance Notices of Infraction.

See, *EX. 3 at page 2*.  The October 1, 2010 version of G.O. OPS 302.10  remained in effect without change until January, 27, 2016.[4]  *EX. 5 at 8:14-17* and *51:20 to 52:7*.

In December 2011, the Plaintiff was detailed out of the ATEU to the Special Events Branch.  *EX. 1, Para. 18*.  Ms. Sutter and Commander Sund told the Plaintiff that his transfer was due to the "civilianization" of the ATEU.  *EX. 1, Para. 18*.  However, MPD did not move toward civilianizing the ATEU as planned; civilianization was not achieved in large measure until May 15, 2016 .  *EX. 1, Para. 18 and 31*; *EX. 4, pages 39:1-40:2*; and *Def. Ex. 3*.  MPD continued to operate the ATEU into 2016 consistent with G.O. OPS 303.10 as an overtime program utilizing sworn members of MPD into 2016. See, *Defendant's EX. 2* showing hundreds of sworn members working more than 100,000 hours of overtime in the ATEU from 2014-2016; *EX. 5 at 6:10-16*; and *EX. 1, Para. 17, 20, 25, 26, and 31*.  MPD increased its use of civilian technicians to ***deploy*** automated speed measuring devices over the years, but the ATEU continued to use sworn members to ***approve and issue*** violations until May 2016.  *EX. 5, 22:21 to 23:10*; *Def. Ex. 2* and *Def. EX. 3*.  See also, *EX. 3 = G.O. OPS 303.10, Sec. III (Definitions), Para. 8*,

---

[4] The MPD website currently has a different version of G.O. OPS 303.10 published that is identical to Plf's *EXHIBIT 3*, including the effective date of October 1, 2010, except for pages 2, 3, and 4 (of 20). See, *EXHIBIT 9*.  On page 2, the above quoted paragraph is omitted.  Those three pages contain a footer that states they were "revised January 27, 2016" but that version was never signed afresh by Chief Lanier nor circulated to members of MPD.  It appears that someone merely inserted new versions of those three pages into the existing, signed and published, G.O. 303.10 bearing an "effective date October 1, 2010."  Regardless of the propriety of that process of revision, the version quoted above was in effect during all of 2014 and 2015 when the Plaintiff was seeking overtime opportunities in the ATEU.

defining a "member" to include only a sworn officer and Section I explicitly stating that the ATEU Program "utilizes sworn members" who have been "certified" through specialized training who "review potential violations to determine the validity thereof, and to approve for issuance Notices of Infraction" while "lieutenants, sergeants and [certified] officers . . . monitor and operate the mobile and fixed [speed measuring devices]". *EX. 3.*

The Plaintiff renewed his request to work the ATEU overtime program in early 2014, but his requests were denied. *EX. 1, Para. 21* and *EX. 4, 15:2-15*. MPD instead selected sworn members who ***were trained and certified by the Plaintiff*** and Sgt. Garner with more than 30 of them working over 1000+ overtime hours in 2014-2016. *Def. Ex. 2 at pages 4-9*. Several of those members worked more than 1500 overtime hours with one member working more than 2000 overtime hours. *Def. Ex. 2 at pages 4-9*. The Plaintiff worked only 525.75 overtime hours in the Special Events Branch during the same time period. *Def. Ex. 2 at page 3, Paragraph 6*. The Plaintiff would have accepted and worked more than 525.75 hours if he had been allowed to work ATEU overtime. *EX. 1, Para. 29 and 30.*

The Defendant first denied the Plaintiff ATEU overtime on the basis that the unit was being civilianized. *EX. 1, Para. 22*. In 2014, the Defendant, through Ms. Sutter and Commander Sund, denied the Plaintiff ATEU overtime on the basis that the Plaintiff was not eligible under GO OPS 303.10 because too much time had lapsed since he had

operated ATEU devices.  *EX. 1, Para. 22* and *EX. 4, pages 42-43.*  In May 2016, the

Defendant's designee stated in Answer to Interrogatory No. 1 (*EX. 6*) that the Plaintiff's

past performance was a reason for denying the Plaintiff ATEU overtime work, citing its

Response to Request for Production No. 16 (*EX. 7 and 8*).  In July 2016, the Defendant's

(same) designee surmised in deposition that the Plaintiff was denied ATEU overtime

because he had not participated in the lottery from which participants were selected for

overtime opportunities.  *EX. 5 at 63:20 to 64:3.*  Ms. Sutter's Affidavit in support of

Defendant's Motion for Summary Judgment, dated December 9, 2016, does not state why

she excluded the Plaintiff's from the ATEU program, although she describes the

incremental civilianization of the unit from 2011 to 2016.  *Def. Ex. 3, Para. 2-6.*  Ms.

Sutter also mentions in her Affidavit that ATEU overtime was limited to certified

operators in conformity with G.O. OPS 303.10 but she does not assert that the Plaintiff's

certification had lapsed.  *Def. Ex. 3, Para. 5.*  In its Motion for Summary Judgment, the

Defendant argues that the Plaintiff was not reinstated to the ATEU program because it

was civilianized and that he was excluded from ATEU overtime because no sworn

officers were assigned to the ATEU on a full time basis.  *Mtn. at page. 12.*

The Plaintiff perceived Ms. Sutter to be motivated by discriminatory intent based

on the Plaintiff's race.  *EX. 1, Para. 24.*  Ms. Sutter selected Sgt. Terry Thorne, a white

male with less qualifications than the Plaintiff, to train additional sworn members to

become certified in 2014 which resulted in all of those trainees being disqualified due to a

problem with Sgt. Thorne's qualifications.  See, *EX. 1, Para. 26* and *EX. 5, 37:12-14* and *51:11-18*.  Ms. Sutter also allowed Sgt. Keith Blakely, a white male with less qualifications than the Plaintiff, to work overtime in the ATEU (*EX. 5 at 51:19-21* and *54:4-10*) while asserting that the Plaintiff was ineligible for ATEU overtime because he had been inactive for too long.  *EX. 1, Para. 22 and 25*.  Sgt. Blakely had not operated ATEU devices for many more years than the Plaintiff.  *EX. 1, Para. 25*.

The Plaintiff was the most qualified and experienced certified instructor within MPD in 2014 and 2015. *EX. 1, Para. 27*.  The Plaintiff was involved in the training and certification of all of the officers who worked ATEU overtime in 2014-2016.  *EX. 1, Para. 27*.  Most of the overtime hours the Plaintiff received in the Special Events Branch since February 2014 were mandated by his superior officers.  *EX. 1, Para. 29*.  The overtime hours that the Plaintiff sought to work within the ATEU were all voluntary overtime hours that the Plaintiff could have worked ***in addition to*** the mandatory overtime hours that he worked in the Special Operations Branch.  *EX. 1, Para. 29 and 30*. The Plaintiff had a history of working more than 525 hours of overtime in the ATEU to boost his base pay substantially.  *EX. 1, Para. 29-30 and EX. 10*.

Ms. Sutter was always more responsive to the white members and technicians. *EX. 1, Para. 34*.  The Plaintiff complained to Commander Sund about the way Ms. Sutter treated him and informed Cmdr. Sund that the Plaintiff believed that race was a motivating factor in Ms. Sutter's decisions affecting the Plaintiff.  *EX. 1, Para. 34*.  Ms.

Sutter and Cmdr. Sund knew the Plaintiff wanted to work ATEU overtime and that he had recently complained of race discrimination at the time they excluded him from ATEU overtime in 2014. *EX. 4, pages 32-33* and *EX. 1, Para. 21, 34 and 36.* Ms. Sutter's treatment of the Plaintiff resulted in Commander Sund dispatching an intermediary to act as buffer between Ms. Sutter and the Plaintiff. *EX. 4, pages 27-28* and *EX. 1, Para. 34.*

The Plaintiff's base salary in 2009 was $83,797.00 but with overtime he earned $143,292.00 (70% increase due to overtime). In 2010, the Plaintiff's base pay was $87,987.00 but with overtime he earned $160,076.00 (81% increase due to overtime). In 2011, the Plaintiff's base salary was $87,987.00 but with overtime he earned $126.969 in 2011(44% increase due to overtime). See, EXHIBITS 18 and 19.

Additional facts will be supplied in the Argument, below.

## III.  STANDARD OF LAW FOR SUMMARY JUDGMENT PROCEDURE:

### A.  Summary Judgment Procedure in General.

A party is entitled to summary judgment only if there is no genuine dispute of material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a). Summary judgment involves the determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable inferences must be drawn in favor of the nonmoving party because "[c]redibility determinations, the weighing of inferences and the drawing of inferences from the facts are jury functions," *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. at 255.  If reasonable minds could differ over the import of the

evidence, summary judgment cannot properly be granted.  *Anderson*, 477 U.S. at 250-51.

The initial burden is on the defendant, as the moving party, to demonstrate the

absence of any genuine issue of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).  The facts and all reasonable inferences

available from the facts must be viewed in the light most favorable to plaintiff when the

Defendant moves for summary judgment.  *United States v. Diebold*, 369 U.S. 654, 655,

82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).  The non-moving party then has a duty to

produce material facts that would be admissible at trial on the legal issues involved in the

case, but those facts do not have to be submitted in a form that would be admissible at

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986).

### B.  Summary Judgment in Employment Discrimination Cases.

In employment discrimination cases, summary judgment procedure follows the

same analysis that is applied during trial, the *McDonnell–Douglas* framework.  *Aka v.

Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. *en banc* 1998); and *Brady v. Office

of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008).

> Lest there be any lingering uncertainty, we state the rule clearly:  In a
> Title VII disparate-treatment suit where an employee has suffered an
> adverse employment action and an employer has asserted a legitimate,
> non-discriminatory reason for the decision, the district court need not-and
> should not-decide whether the plaintiff actually made out a prima facie case
> under McDonnell Douglas.  Rather, in considering an employer's motion

for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin? See [*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)]; [*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)].

*Brady,* 520 F. 3d at 494.

Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (***and at summary judgment***) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment). That is not to say that every plaintiff must always present evidence in each of these categories in order to avoid summary judgment. (Emphasis added.)

*Aka*, 156 F.3d at 1289.

Courts have also observed that the nature of employment discrimination cases do not lend themselves well to summary judgment procedure.

Courts evaluating motions for summary judgment in discrimination cases are advised to proceed with additional caution and to apply a heightened degree of scrutiny.

*Jones v. District of Columbia*, 346 F. Supp. 2d. 25, 37 (D.C.C. 2004) (reversed on other grounds, 429 F.3d 276 (D.C. Cir. 2005)).  (See, for comparison, *Alexander v. Wisconsin Dept. Of Health and Family Services*, 263 F. 3d 673, 681 (7th Cir. 2001), explaining that

the "added rigor" applied to summary judgment analysis in discrimination cases does not

alter the analysis itself, but rather, emphasizes that judges must be mindful that

discrimination cases typically involve questions of intent and credibility which are not

appropriate for summary judgment.)  See, also, *Ballinger v. North Carolina Agricultural*

*Extension Service*, 815 F.2d 1001, 1004-05 (4th Cir. 1987), cert. denied 484 U.S. 897

(1987), where the Fourth Circuit emphasized that "summary judgment is seldom

appropriate in cases wherein particular states of mind are decisive as elements of [a]

claim or defense, *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979),

[and] courts must take special care [] ***because motive often is the critical issue in***

***employment discrimination cases***."  815 F.2d at 1005. (Emphasis added.)

In the final analysis, a plaintiff is not required to supply proof of discrimination

above and beyond evidence sufficient to show that a jury could reject the employer's

proffered explanation, *Aka*, 156 F.3d 1292, citing *Hicks*, 509 U.S. at 511, and *Rothmeier*

*v. Investment Advisers, Inc.*, 85 F.3d 1328, 1333-35 (8th Cir.1996), because direct

evidence of discriminatory intent is not required to prove a claim of disparate treatment.

*United States Postal Serv. v. Aikens*, 460 U.S. 711, 714 n. 3, 717, 103 S.Ct. 1478, 75

L.Ed.2d 403 (1983).  Hence, in appropriate cases, "'[t]he factfinder's disbelief of the

reasons put forward by the defendant" will allow it to infer intentional discrimination"

from other evidence produced by the plaintiff.  *Aka*, 156 F.3d 1294, quoting *Hicks,* 509

U.S. at 511, 113 S.Ct. 2742.  Summary judgment must be denied where a reasonable jury

could infer discrimination or retaliation from "all the evidence, which includes not only the *prima facie* case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [any] other evidence." *Morris v. McCarthy*, 825 F.3d 658, 652 (2016), quoting, *Gaujacq v. EDF, Inc*., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

With these principles in mind, the Plaintiff submits the following arguments.

## IV.  THE PLAINTIFF CAN ESTABLISH A *PRIMA FACIE* CASE OF RACE DISCRIMINATION AND RETALIATION.

The Defendant argues that the Plaintiff has not made out a *prima facie* case of discrimination because (1) he did not suffer an adverse employment action, and (2) the Defendant had a legitimate, non-discriminatory reason for denying Plaintiff's request to work within the ATEU.  As shown below, the Defendant is wrong and its non-discriminatory reason is subject to a credibility determination.  Moreover, the issue before the court is less about whether the Plaintiff could establish a *prima facie* case from the start, but rather, can a reasonable jury infer from the evidence presented that the true reason for excluding the Plaintiff from ATEU overtime opportunities was because of his race as opposed to the stated reason(s) provided by the Defendant.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993);[*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Baloch v. Kempthorne*, 550 F. 3d 1191, 1197, fn. 2 (D.C. Cir. 2008).

**A.  The Plaintiff has a *prima facie* case of unlawful racial
discrimination because less qualified similarly situated Sergeants
of the white race were allowed to work in the ATEU.**

Whether another employee is comparable to the Plaintiff for purposes of inferring

unlawful discrimination based on disparate treatment is a question of fact for the jury.

*Wheeler v. Georgetown Univ. Hosp.*, 812 F. 3d 1109, 116 (D.D.C. 2016), citing, *George*

*v. Leavitt*, 407 F. 3d 405, 414-15 (D.C. Cir. 2005).  A similarly situated employee is one

who shares similar job duties and, ordinarily, was under the supervision of the same

person.  *Id*.  In the context of this case, Sgt. Thorne was a similarly situated employee

compared to the Plaintiff because he held the same rank, he was certified to operate some

of the ATEU devices used by MPD, and he had some supervisory experience in the

ATEU.  Sgt. Thorne was also similarly situated to the Plaintiff because his selection to

work in the ATEU in 2014 was made by Ms. Sutter.

Ms. Sutter selected Sgt. Thorne in 2014 to teach and certify approximately 60

sworn members to supplement the pool of certified members previously trained by Sgt.

Robinson and Sgt. Garner in the 2000's and in the lottery class of 2010.  However, Sgt.

Thorne was not qualified in 2014 to teach photo radar whereas the Plaintiff was a

certified instructor in photo radar operations.  Sgt. Thorne was only qualified to instruct

on older, traditional radar devices.  Sgt. Thorne was not qualified to certify others in the

use of  photo radar devices.  Thus, Ms. Sutter's selection of Sgt. Thorne to work in the

ATEU in 2014 could not have been based on the merits of his qualifications, his

experience, or any other legitimate business purpose as compared to the Plaintiff.

Ms. Sutter also selected Sgt. Blakely to work ATEU overtime opportunities in

2014.  Sgt. Blakely was a similarly situated employee compared to the Plaintiff because

he held the same rank, he was certified to operate some of the ATEU devices used by

MPD, and he had some supervisory experience in the ATEU.  Sgt. Blakely was also

similarly situated to the Plaintiff because his selection to work ATEU overtime in 2014

was made by Ms. Sutter.  However, Sgt. Blakely had not operated ATEU devices since

2006 while the Plaintiff had been working full-time in the ATEU until December 2011.

Nor had Sgt. Blakely participated in the ATEU lottery in 2010.  Therefore, if the Plaintiff

was not eligible to work ATEU overtime because of inactivity or because he had not

participated in the 2010 lottery, then Sgt. Blakely was also not eligible to work ATEU for

those same reasons.  Nevertheless, Ms. Sutter approved Sgt. Blakely to earn overtime

wages through the ATEU program.  Thus, Ms. Sutter's selection of Sgt. Blakely in 2014

could not have been based on the merits of his qualifications, his experience, or any other

legitimate business purpose as compared to the Plaintiff.  At the very least, there is

sufficient comparability to defeat summary judgment and submit the issue of race

discrimination to a jury.  *Wheeler v. Georgetown Univ. Hosp.*, supra.[5]

---

[5] While the District of Columbia could argue that Ms. Sutter's decision was the product
of either incompetence or a race-neutral dislike of the Plaintiff, a status claim of discrimination
only requires that the status (race) be a motivating factor.  See, *Gross v. FBL Financial Services,
Inc.*, 557 U.S. 167, 174, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (noting that  "Congress has [ ]

**B.  The Plaintiff has a *prima facie* case of unlawful retaliation.**

The Plaintiff had complained in the recent past of race discrimination in the selection of persons who were allowed to work in the ATEU overtime program. Although that litigation resulted in summary judgment for the Defendant, Ms. Sutter was clearly the focal point of the Plaintiff's previous discrimination claim.  See, Plaintiff's email of December 8, 2011, to several high ranking MPD officials asserting race based discrimination and a racially hostile environment created by Ms. Sutter.  See, EX. 16.[6] The Plaintiff's allegations against Ms. Sutter were formalized and ultimately led to Ms. Sutter being interviewed internally by MPD's EEO investigator.  See, EXHIBIT 17.  Ms. Sutter's knowledge of the Plaintiff's complaints of discrimination against her, coupled with Ms. Sutter's disparate treatment of the Plaintiff compared to Sgt. Thorne and Sgt. Blakely, creates a *prima facie* case of unlawful retaliation.  Ms. Sutter's discriminatory conduct occurred within two months of the conclusion of the Plaintiff's previous lawsuit. Close temporal proximity is a factor in whether the employee's claim makes out a *prima*

---

amended Title VII by explicitly authorizing discrimination claims in which an improper consideration was "a motivating factor" for an adverse employment decision."  Under the circumstances of this case, the total exclusion of the Plaintiff from the ATEU overtime program in spite of his unassailable qualifications creates a reasonable inference that unlawful discrimination was a motivating force.

[6] The thrust of the Plaintiff's allegation against Ms. Sutter is clear despite his misspelling the word "disparate", saying, "this is blatant despaired treatment that  is unwanted and intolerable based on EEOC standards which demands equal treatment of all government employees.  It is unlawful to discriminate against government employees because of race and or gender.  This shall serve as another documented instance of discrimination against me in the work place because of my race and gender, and I am continuing to exclaim that this is a hostile work environment."  EXHIBIT 16.

*facie* case for unlawful retaliation.  *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 83-84

(D.D.C. 2013).

### C.  There is a genuine dispute about whether the Defendant's explanation is authentic or pretextual.

Once an employer produces evidence of a legitimate non-discriminatory

explanation for its adverse action, the presumption of unlawful discrimination created by

the employee's *prima facie* case disappears.  *St. Mary's Honor Center v. Hicks*, 509 U.S.

502, 506 (1993).  Evidence that the employer's explanation is not credible will create a

question of fact for the jury to decide whether the employee has proven that the reason

was false and that discrimination was the real reason. 509 U.S. at 515.  An employee can

challenge the employer's non-discriminatory explanation on its merits, as well as,

showing by other means that the explanation is pretext to disguise illegitimate bias.  *Aka*

*v. Washington Hosp. Center*, 156 F. 3d 1284, 1299 (D.C. Cir. 1998).  Of course, at the

summary judgment stage, the trial court must view the employee's attack on the

employer's explanation in the light most favorable to the employee and using all

reasonable inferences in favor of the employee as the nonmoving party.  *Talavera v.*

*Shah*, 638 F. 3d 303, 308-09 (D.C. Cir. 2011) (reversing summary judgment on

employee's non-promotion gender discrimination claim on the basis that the district court

had failed to properly view the employee's evidence of pretext).

In this case, the Defendant asserts in its Motion for Summary Judgment that it

denied the Plaintiff's request to return to the ATEU "because the ATEU was civilianized

in 2011, and after the civilianization, no sworn officers were assigned to full-duty

positions in the ATEU, citing Paragraphs 2 and 3 of Ms. Sutter's Affidavit.  *Mtn. at p. 12.*

From there, the Defendant emphasizes that the Plaintiff has "failed to identify a single

sworn officer who was re-assigned to full-duty in the ATEU." *Mtn. at p. 13.*  This

argument is pretext by diversion.  It is sleight of hand.

The essence of the Plaintiff's Complaint is that he was deprived the opportunity to

earn overtime wages that were being earned by hundreds of other sworn officers in 2014-

2016.  The Plaintiff's request to return to the ATEU was just a vehicle through which he

would be in position to work ATEU overtime, just as Sgt. Thorne was when he was

detailed to the ATEU in 2014 to teach and certify a new class of sworn members.  The

fact that the Defendant discontinued "full-duty" assignments to the ATEU after

civilianization was started in 2011 is immaterial because overtime opportunities

continued *in abundance* through 2016 as shown by the *150,000+ overtime hours* for the

two year period disclosed in the Affidavit of Priya Mathews.  See, *Defendant's Exhibit 2*

*at pages 4-12.*

The material facts in dispute relate to the availability of ATEU overtime hours

from 2014-2016.  The hours that were eliminated through the use of civilian employees

instead of sworn members is immaterial.  The Defendant's reliance on the civilianization

process is a diversion tactic.  The transformation of the ATEU into a civilian unit did not

automatically eliminate the lucrative overtime opportunities for sworn members and does not exempt the Defendant from anti-discrimination statutes.

The Defendant's own evidence shows why the Plaintiff has suffered an actionable adverse employment action — he got ZERO of the 150,000+ ATEU overtime hours distributed to volunteers since 2014.  The Defendant's effort to characterize the unit as civilianized since 2011 is a gross distortion of the events.  Sworn officers have been working ATEU overtime for the last five years in huge numbers, albeit less than a decade ago.  The Defendant's "civilianization" explanation is a pretense in the context of this dispute.  The Defendant's explanation is not credible under the circumstances because the Plaintiffs has been excluded approximately $10,000,000.00 of ATEU overtime wages in the last two years.[7]  The Defendant is trying to paint the picture that the non-existence of full-duty positions in the ATEU had no financial consequence.  The Defendant's explanation is an attempt to divert attention away from the massive ATEU overtime opportunities that continued to exist into 2016.

The Defendant's explanation for excluding the Plaintiff from the lucrative ATEU overtime has changed several times, thereby leading to an inference that the explanation serves to conceal unlawful discriminatory conduct.  The Defendant's explanation has changed four times.  The original "civilianization" explanation switched to a lapse in Plaintiff's certification when the Plaintiff questioned why Sgt. Thorne had been recruited

---

[7] The list of hours in Defendant's Exhibit 2 shows approximately 150,000 hours. Multiplied by $65.00 per hour (overtime is 1.5 x usual hourly rate is $9,750,000.00.

to work in the ATEU instead of the Plaintiff.  The Defendant switched its explanation again when the Plaintiff discovered that Ms. Sutter had allowed Sgt. Blakely to work ATEU overtime despite being absent from the unit longer than the Plaintiff.  The Defendant's designee has given different explanations during this litigation, including, performance issues (EX. 7), the Plaintiff failed to enter his name into the lottery system (EX. 5), and the "civilianization" of the unit (EX. 7 and Def. Ex. 3).  A jury should adjudge the credibility of the Defendant's proffer and measure it against the counter-evidence of discrimination presented by the Plaintiff.    The Plaintiff's indirect evidence of unlawful discrimination is more than sufficient to create a jury question juxtaposed against the Defendant's shifting explanations.

In short, the Plaintiff's evidence is legally sufficient to make out a *prima facie* case.  It is a jury function to decide whether the true motivating force for excluding the Plaintiff from the ATEU and its overtime opportunities was his black race or retaliation for his complaint of discrimination.

### D.  Deprivation of voluntary overtime is an adverse action.

The Supreme Court has defined an adverse employment action for a status-based discrimination claim to include any "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  The Supreme Court gave examples of tangible

employment action; it did not restrict Title VII claims to only actions involving

termination, failing to promote or reassignment.  In that vein, this Circuit has noted that

adverse actions *typically* take the form of termination, denial of promotion, or reduction

in salary, 550 F. 3d at 1196, but Title VII does not limit claims to those three events.

*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).

    Lost overtime opportunities constitute an adverse employment action when the

employee's evidence, such as sworn testimony, provide a basis from which a trier of fact

could reasonably conclude that employer was aware of employee's desire to work

overtime.  See, *Bell v. Gonzales*, 398 F.Supp.2d 78, 97 (D.D.C.2005) (observing that "the

denial of a discretionary monetary bonus, even where the amount is not substantial, could

be considered an adverse employment action, citing *Russell v. Principi*, 257 F.3d 815,

819 (D.C.Cir.2001).  See, also, *Sims v. District of Columbia*, 33 F.Supp.3d 1, 7 (D.D.C.

2014), which cited *Bell v. Gonzales* but distinguished its facts from those in *Sims*.

    The Plaintiff suffered adverse employment actions in 2014 when he was denied an

opportunity to work within the ATEU by teaching and certifying other members (Sgt.

Thorne) where he would be in place to accept overtime opportunities[8] and, more directly,

when the Plaintiff was not allowed to participate in the ATEU overtime as an operator or

supervisor deploying traffic enforcement devices or reviewing violations and notices of

---

[8] Since the ATEU was expressly created as an overtime project, any assignment to the
ATEU, whether full-duty or temporary duty, would likely lead to overtime work.  See, EX. 2 -
G.O. 303.10, at pages 1-2.  ___.

infractions generated by subordinate officers or civilians.  A reasonable trier of fact could find the deprivation of overtime opportunities to be an objectively tangible harm, *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C.Cir. 2002), ***in this case because the Plaintiff had a long personal history of accepting overtime work.  In 2009-2011, the Plaintiff approached doubling his base pay through ATEU overtime opportunities.***  It is therefore the province of the jury to determine whether the Plaintiff would have volunteered and worked the ATEU overtime in 2014-2016 if he had not been unlawfully excluded on the basis of his race or because of unlawful retaliation for his recent complaints of racial discrimination.

## IV.  CONCLUSION:

The Defendant is not entitled to summary judgment.  The Plaintiff has shown that there are genuine disputes of material facts and that, if certain facts and inferences are credited by the jury, they are legally sufficient to support a judgment under Title VII and the D.C. Human Rights Act in favor of the Plaintiff.

Respectfully submitted,

_____/s/_____

Kenneth E. McPherson, Bar #419177
*Attorney for Plaintiff*
6801 Kenilworth Avenue
Suite 202
Riverdale, Maryland 20737
301-277-4727   office
240-432-8970   cell
301-699-8706   fax
kemlawyer@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February 2017, I served electronically a copy of the foregoing via the EFC system to:

PHILIP A. MEDLEY, Assistant Attorney General
Office of the Attorney General
    For the District of Columbia
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001

*Counsel for Defendant*

_____/s/_____
Kenneth E. McPherson

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MARK ROBINSON          :
                                       :

        Plaintiff         :
                                         :

        v.                  :     Case No. <u>15-cv-444 (RC)</u>
                                       :

DISTRICT OF COLUMBIA   :
                                       :

        Defendant    :

_____

## <u>ORDER</u>

UPON CONSIDERATION OF the Defendants' Motion for Summary Judgment

and the Plaintiff's Opposition thereto, it is this _____ day of _____,

2017,

ORDERED, that said Motion is hereby DENIED.


_____
JUDGE
United States District Court
for the District of Columbia

`