# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

MARK E ROBINSON                    :
                                   :
        Plaintiff                  :
                                   :
    v.                             :     Case No.  <u>15-cv-444 (RC)</u>
                                   :
DISTRICT OF COLUMBIA               :
                                   :
        Defendant                  :
_____

## AFFIDAVIT OF
## MARK E. ROBINSON, PLAINTIFF

I, MARK ROBINSON, do hereby swear and affirm under the penalties of perjury that the following statements are true and correct to the best of my knowledge, information and belief, and that I am competent to testify thereto.  All statements made below are based on my personal observations or statements made by MPD officials.  All exhibit numbers correspond to the exhibits attached to the Plaintiff's Memorandum of Law filed contemporaneously with this Affidavit.

1.  I was employed as a sworn law enforcement officer by the Fairfax County Police Department before I was employed by MPD.

2.  In 1989, I was certified in the use of radar speed measurement devices.  See, EXHIBIT No. 1.

3.  On April 23, 1990, I was hired by MPD.

4.   I have devoted my law enforcement career to traffic safety.  I have earned numerous certifications related to accident reconstruction, enforcement of drunk driving laws, and speed measuring devices.  EX. 2.

5.   In 1991, I was certified by MPD in the use of Traffic Doppler Radar devices to measure the speed of motor vehicles.  EX. 2.

6.   In 1993, I was certified as an *Instructor* of radar devices.  EX 2.

7.   In 1996, the District of Columbia authorized MPD to operate photo devices to enforce moving violations.  In subsequent years, MPD expanded its use of technical devices to include automated traffic enforcement devices, including mobile, stationary and fixed devices.  See, General Order OPS 303.10, Sec. I - Background, marked as EX. 3.  I kept myself informed about these developments because of my interest and work in traffic safety.

8.   In or about 1998, MPD contracted with Affiliated Computer Services ("ACS") as the vendor for MPD's automated traffic devices.  As a result, Chief Lanier issued the original General Order, entitled "Automated Traffic Enforcement Program", known as G.O. OPS 303.10 .

9.   In 2001, I was certified as a Lidar Instructor (laser speed detection equipment). EX. 2.

10.   In 2004, I was certified by the ACS Field Service Training division to operate Photo Radar speed measuring equipment.  EX. 2.  That same year, I was promoted to the rank of Sergeant and detailed for a temporary assignment to work in the ATEP, commonly referred to as the "ATEU".

11.  In 2006, MPD replaced ACS as the vendor by contracting with American Traffic Solutions ("ATS") for automated traffic devices.  I personally know this fact because I worked with employees of ATS and I saw documents reflecting the identity of ATS as the contractor for MPD.  However, sworn members of MPD were still required to approve violations and Notices of Infraction before they were sent to motorists.

12.  On April 13, 2008, I was permanently assigned to work in the ATEU.

13.  In 2008, Sgt. Sharion Garner and I were tasked with drafting revisions to G.O. OPS 303.10 to reflect the certification process for members to operate devices in the ATEU. Sgt. Garner and I worked under the supervision of Lisa Sutter and Commander Sund.  The result of our effort was the G.O. OPS 303.10 issued on October 1, 2010, signed by Chief Lanier.  That version of the G.O. OPS 303.10 was in effect during all times relevant to this matter and contained the following statement informing the public that the program was operated by sworn members working exclusively in an overtime capacity.

> The ATE Program utilizes sworn Metropolitan Police Department members who have been certified through training to set up, test and operate the software and hardware that is installed both in the vehicles and in the fixed apparatus, to ensure that violations that are captured can be processed as Notices of Infraction (NOIs). These members receive compensation for a duty assignment that is outside of their regular assigned duties and responsibilities and tour of duty, in accordance with MPD regulations.

See, *EX. 2 at page 2.*[1]

---

[1] The MPD website currently has a different version of G.O. OPS 303.10 published that is identical except for pages 2, 3, and 4 (of 20).  See, *EX. 9.*  On page 2 of the newly published version, the above quoted paragraph is omitted.  Pages 2, 3 and 4 now contain a footer that states

14.   From 2000-2011, Sgt. Garner and I created and implemented lesson plans and drafted the training manuals used by MPD for its speed measuring devices.  Sgt. Garner and I taught the classes attended by all MPD members who thereby qualified to work overtime in the ATEU as certified operators.

15.   In 2008, MPD announced that is was accepting volunteers to work overtime in the ATEU.  The volunteering members were required to undergo training and testing to become certified in the operation of MPD's automated traffic equipment.  Those who qualified would be eligible to apply each month for overtime opportunities in the ATEU.  Sgt. Garner and I were the instructors for those members.  MPD received 855 volunteers seeking to become certified so that they could participate in the lucrative ATEU overtime program.  The list of members were reduced down by lottery to 213 members.  Sgt. Garner and I trained those members so they were certified to operate the automated traffic devices.  Those 213 newly certified operators were *in addition to existing certified operators, like myself, who were actively working ATEU overtime opportunities and who continued to work ATEU overtime program through 2016.*

16.   As certified instructors, neither Sgt. Garner nor I were required to participate in the lottery system to work within the ATEU because we were already certified to operate the

_____

it was "revised January 27, 2016" but that version was never signed afresh by Chief Lanier nor circulated to members of MPD.  *EX. 9.*  It appears that someone merely inserted new versions of those three pages into the existing, signed and published, G.O. 303.10 bearing an "effective date October 1, 2010."  *EX. 9.*  Regardless of the propriety of that revision, the version quoted above and marked as *EX. 2* was in effect during all of 2014 and 2015 when I was requesting overtime opportunities with the ATEU.

devices.[2]  There was no member certified above Sgt. Garner and me.  Ms. Sutter knew I was

qualified to work overtime hours deploying automated devices and approving Notices of

Infractions.[3]

17.    By 2014, MPD was utilizing some civilian technicians to deploy automated

traffic devices under the supervision of sworn members.  This was consistent with G.O. OPS

303.10 (EX. 3) which required a "member" to issue a Notice of Infraction for a traffic

violation in the District of Columbia.  A "member" is defined to include only a sworn officer.

See, G.O. OPS 303.10, Sec. III (Definitions), Para. 8.  Furthermore, G.O. OPS 303.10

explicitly states that the ATEU Program "utilizes sworn [MPD] members" who "receive

compensation . . . outside of their regular assigned duties and responsibilities and tour of

duty...."  EX. 3 at page 2, "Section I - Background".  This accounts for why Def.'s Ex. 2

shows numerous officers and Sergeants working thousands of overtime hours in the ATEU

during 2014-2016 despite the alleged civilianization of the unit in 2011.[4]

18.    In my deposition, I testified to the reason I was *told by my supervisor* for being

detailed to the Special Events Branch in December 2011.  I truthfully stated that I was *told*

my transfer was due to the civilianization of the ATEU.  I was *not* thereby admitting that the

---

[2] The "non-active" status contained in G.O. OPS 303.10 Section V applies only to newly trained operators who fail to participate in three ride-alongs with experienced operators and fail to deploy solo shifts within four months of completing training.  EX. 3.

[3] G. O. OPS 303.10 requires sworn officers to approve Notices of Infraction generated by civilians and as review officers for potential violations.  See, EX. 3, at page 2.

[4] It is true that some of the automated speed measuring devices were deployed by civilian technicians, but not to the total exclusion of sworn members of MPD.  Otherwise, there would be no overtime paid to sworn members during the years 2014-2016.

true motivation for transferring me was the reason **told** to me.  That is, I was conveying the reason given to me by Ms. Sutter and Cmdr. Sund for the Defendant's act of sending me out of the ATEU.  I was **not** acknowledging that MPD actually civilianized the ATEU to the exclusion of sworn members of MPD.  Again, Defendant's Ex. 2 shows that during 2014-2016 MPD members worked more than 100,000 hours of overtime in the ATEU, all of whom had less qualifications than me.  The ATEU overtime opportunities were available to every sworn member who was previously certified to operate the automated devices or newly certified through the 2010 lottery system.  I was not expected or required to participate in the lottery system because I was already a certified operator and a certified instructor. Reinstatement into the ATEU would have enabled me to work ATEU overtime without "applying" for it because there were many occasions when members selected did not show to work, I would have to meet with the contractor to repair cameras that were taken out of service, and teach classes.  The written and verbal requests I made to Ms. Sutter and Cmdr. Sund included my desire to participate in the ATEU overtime program. See, for example, my email dated Feb. 21, 2014, to Cmdr. Sund (cc to Ms. Sutter), stating,

> **I am requesting** to be afforded the same opportunity **to participate in the overtime program** which is avialbe six days a week, and twenty four hours each dat to certified members of [MPD].

*EX. 13.*  In the deposition excerpts cited by the Defendant (*Def. EX. 1, pages 20-21, 31, and 43*), I was referring to ATEU work that would lead to overtime opportunities regardless of whether or not I was reinstated to the ATEU itself because my goal was to earn overtime wages.

19.   When I testified in my deposition that I was **told** that my requests to work ATEU overtime were denied because I was not eligible, I was relating what I was **told** by the Defendant.   I was **not** agreeing that I was ineligible to work overtime in the ATEU.   I did meet the qualifications of a certified traffic enforcement operator contrary to the Defendant's assertion in Paragraph 9 of its Statement of Material Facts.

20.   G.O. OPS 303.10 (EX. 3) had not been vacated, superseded, amended, or modified to enable or reflect the transformation of the ATEU into a civilian unit before Jan. 27, 2016.

21.   From February 2014 forward, I made requests to work in the ATEU overtime program but all of my requests were denied.

22.   MPD changed its reason for excluding me from ATEU overtime from the "civilianization" process to an assertion that I was not eligible to operate automated traffic enforcement devices because I had been inactive in the ATEU.   That explanation is based on a misreading of GO OPS 303.10 that MPD has never asserted with respect to any other instructor.

23.   Since I filed this lawsuit, MPD's changed its reason for excluding me from ATEU overtime again.   MPD's corporate designee suggested in her deposition that I was not allowed to participate in the ATEU because I did not submit my name for the lottery in 2010. In its Motion for Summary Judgment, MPD has returned to the "civilianization" excuse.

24.   I perceived Ms. Sutter to discriminate against me based on my race.   MPD's explanations for excluding me from the ATEU overtime opportunities are inconsistent with

the way the ATEU has always operated and my role as a manager of the ATEP.

25. Sgt. Keith Blakely, who is a white male with less qualifications than me to work in the ATEU,  was allowed to work in the ATEU even though he was not one of the 213 lottery members and he had not actively used ATEU equipment for many years.  The only way Sgt. Blakely could receive ATEU overtime over me was if MPD applied the eligibility requirements to him differently than MPD applied those same requirements to me. Sgt. Keith Blakely was less qualified than me because he was not trained on the SC 300 Digital Radar system, a system that I assisted MPD's vendor (ATS) with establishing specifications to deploy the device in the District of Columbia, and I provided instructions to all certified MPD members.  Sergeant Blakely admitted to the defendant that he had not worked overtime with ATEU in eight  years and he had not been trained on the latest equipment, but he was permitted by Ms. Sutter to participate in the ATEU overtime in violation of GO OPS 303.10. See, also, EXHIBIT 12 =  email communications between Sgt. Blakely and Ms. Sutter in January 2014.

26.  In 2014, Sgt. Terry Thorne was selected to teach a 40 hour photo radar certification class in the ATEU.  I was qualified to train and certify others in photo radar devices but Sgt. Thorne was only certified to teach traditional radar devices.  Sgt. Thorne was not certified to teach photo radar classes in 2014.  Sgt. Thorne is a white man.  Sgt Thorne was also not on the eligibility list created from the lottery in 2014.  EX. 5, page 51, lines 11-16.  All of Sgt. Thorne's trainees were denied certification because a problem was identified with respect to Sgt. Thorne's qualifications.  See, EX. 5, page 35, line 9 to 37, line 5.

27.  I am more qualified to work in the ATEU overtime program than all of the white sworn members who earned overtime wages listed in Defendant's Ex. 2 because I am a certified instructor.  Sgt. Garner and I trained all of those members and issued and signed their certifications which enabled them to work overtime in the ATEU.  There were no other certified instructors above us.

28.  G.O. OPS 303.10 Sec. A V was designed to allow operators that have been inactive for more than 12 months the opportunity to be evaluated by a ATEU Official/ Instructor to determine their proficiency to deploy mobile and fixed seed cameras without the necessity of conducting three new "ride-alongs" required for newly certified operators.

29.  Most of the overtime hours I worked in the Special Events Branch since February 2014 were mandated by my superior officers.  The overtime hours that I sought to work within the ATEU were all voluntary overtime hours that would be *in addition to* the mandatory overtime hours that I was required to work as a result of my current assignment, consistent with G.O. OPS 303.10, Section I - Background, at page 2 of 20.

30.  If I had been allowed to work overtime hours in the ATEU, I would have earned $76.00 per hour based on my usual hourly rate of $50.48 per hour in 2014-2016.  I had a history over my years in the ATEU of working approximately 1500-2000 overtime hours per year.  I would have accepted the same amount of ATEU overtime hours in 2014, 2015, and 2016 if I had not been unlawfully discriminated against on the basis of my race.

31.  The Affidavit of Lisa Sutter (Defendant's Ex. 3) creates a misrepresentation.  The ATEU was not civilianized in 2011 (Def. Ex. 3 at Para. 1) because Defendant's Ex. 2 lists

numerous sworn members that I trained who earned ATEU overtime in 2014, 2015 and 2016 - five years after Ms. Sutter claims that the ATEU was civilianized.  MPD has always used civilian technicians in the ATEU alongside a sworn photo radar certified operator.  In 2011, MPD starting using civilian technicians for other types of speed enforcement devices but the overtime program continued unabated until 2016 when MPD modified G.O. OPS 303.10 by removing the requirement that sworn members sign off on all Notices of Infractions.  MPD has continued beyond May 16, 2015, to use sworn members for overtime opportunities in the ATEU.  See, pages 28-34 of the TACIS records of William O'Connor (white male) showing he worked overtime in the ATEU after May 16, 2015, marked as EX. 11.  I trained William O'Connor.  I was more qualified and experienced than William O'Connor.

32.  The MPD union contract requires the overtime opportunities to be given according to seniority when competing members have equal qualifications.

33.  I have more seniority than all of the persons listed in Defendant's Ex. 2.

34.  Lisa Sutter was the program director in charge of assigning sworn members of MPD to work the ATEU overtime shifts.  Ms. Sutter is white.  I perceived her negative decisions about me to be motivated by unlawful considerations of my race.  She was always more responsive to the white members and technicians.  I complained to Commander Sund about the way Ms. Sutter treated me and informed him that my race seemed to be a factor, including her refusal to give me overtime opportunities for which I was more qualified than all of the white members who were selected by her.  Commander Sund dispatched an intermediary to act as a buffer between Ms. Sutter and I.

35.  The Defendant does not have an effective anti-discrimination policy because I have complained, verbally and in writing, numerous times about unlawful discrimination based on my race but there has been no change in response to my complaints.

36.  Supervisors within ATEU, including, but not limited to, Lisa Sutter and Cmdr. Sund, knew in 2014 that I was complaining about race discrimination when they denied my requests to work in the ATEU overtime program.

37.  I have read the Factual Summary drafted by my lawyer in the Memorandum of Law and I hereby incorporate those facts because they are true and accurate and based on my personal knowledge conveyed to my lawyer.

Respectfully submitted,

_____          _____
Sgt. Mark E. Robinson, Plaintiff                    Date