# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| MARK E. ROBINSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-0444 (RC) |
| | : | | |
| v. | : | Re Document No.: | 19 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The District of Columbia Metropolitan Police Department uses high-tech cameras to catch traffic offenders without the need for real-time observation by police officers. To organize the photographs, analyze evidence of violations, and issue citations, the police department created the Automated Traffic Enforcement Unit ("ATEU"). Plaintiff Mark Robinson, a Sergeant with the Metropolitan Police Department who has devoted his career to traffic safety, worked in the ATEU full-time starting in 2008. In 2011, he began training and certifying sworn officers to work as part of the ATEU Overtime Program, which allowed police officers to supplement their normal workload with traffic-safety work in the ATEU. Mr. Robinson himself logged considerable time in the ATEU—in many years exceeding 1,500 hours of overtime. Then, in December 2011, Mr. Robinson was transferred out of the ATEU as part of a civilianization of the Unit. Although MPD asserts that no sworn officers worked in the ATEU full-time after 2011, the Overtime Program continued, meaning hundreds of officers were able to work there outside of their normal assignments. Mr. Robinson's requests to work overtime,

however, were denied. He believes he was transferred out of the ATEU and denied overtime opportunities because of his race, and thus sues for discrimination. He also believes that his requests for reassignment to the ATEU and overtime were continuously denied because he previously had complained of discrimination, and thus sues for retaliation.

The District of Columbia moves to dismiss on relatively narrow grounds. It argues that neither the reassignment from the ATEU nor the denial of overtime opportunities constituted sufficiently adverse employment actions to support a lawsuit under Title VII of the Civil Rights Act of 1964. It also argues that it had a nondiscriminatory reason for transferring Mr. Robinson—it civilianized the unit, and thus no sworn officer worked in the ATEU on a full-time basis after the transition in 2011.

The civilianization of the ATEU is indeed a valid nondiscriminatory reason for Mr. Robinson's transfer, and Mr. Robinson has not shown any indication that it was not the actual reason that he was transferred. Thus, the Court will grant Defendant summary judgment with respect to Plaintiff's claim that his transfer from the ATEU was discriminatory and retaliatory. But because Mr. Robinson has shown that he sought out and was denied a significant amount of overtime while other sworn officers were allowed to work in the ATEU Overtime Program, he has shown that he suffered an adverse employment action in the form of loss of significant overtime opportunities. As a result, the Court will deny Defendant's motion for summary judgment insofar as it relates to the alleged loss of overtime.

## II.  FACTUAL BACKGROUND

### A.  The Automated Traffic Enforcement Unit

Mr. Robinson is a police officer whose career has been devoted to traffic safety. Aff. of Mark E. Robinson ("Robinson Decl.") ¶ 4, ECF No. 24-1. He has worked for the D.C.

Metropolitan Police Department ("MPD") since 1990.[1]  Robinson Decl. ¶ 3.  Prior to working for MPD, he worked for the Fairfax County Police Department, where he was certified in the use of radar to detect speeding.  Robinson Decl. ¶¶ 1–2.  Shortly after starting with MPD, Mr. Robinson was certified in the use of Traffic Doppler Radar, and then two years later, became certified as an instructor in the use of radar devices to detect speed.  Robinson Decl. ¶¶ 5–6.  In 2004, after having been certified as an instructor for "Lidar"—another speed-detecting device— Mr. Robinson was certified to operate photographic speed measuring equipment.  Robinson Decl. ¶¶ 9–10.  In 2008, Mr. Robinson was permanently assigned, on a full-time basis, to the ATEU, the unit that administers automated traffic tickets based on photographic evidence.  Robinson Decl. ¶¶ 10, 12–13.  In that role, Mr. Robinson worked with other officers to draft MPD regulations pertaining to automated traffic enforcement, instructed classes, and supervised ATEU employees.  Robinson Decl. ¶¶ 12–15.  For over ten years, he also co-taught classes on traffic enforcement for other MPD officers.  Robinson Decl. ¶ 14.

Mr. Robinson, along with other certified ATEU operators, logged significant overtime in the ATEU.  Robinson Decl. ¶ 15.  Shortly after Mr. Robinson began working in the ATEU, MPD solicited officer volunteers to work overtime in the Unit.  Robinson Decl. ¶ 15.  Over 855 MPD members volunteered, of which 213 were selected through a lottery system.  Robinson Decl. ¶ 15.  Because Mr. Robinson was one of the two officers who trained the volunteers to be ATEU-certified and was already working in the ATEU, he claims that he was not required to participate in the lottery system.  Robinson Decl. ¶¶ 15–16.

According to Defendant's affiant—who is also Plaintiff's supervisor—Lisa Sutter, ATEU was civilianized in 2011, after which no sworn officers were employed on a full-duty basis.  Aff.

---

[1] The Court refers to Defendant as "MPD."

of Elisabeth Sutter ("Sutter Decl.") ¶¶ 2–3, ECF No. 19-3.  Mr. Robinson states that Ms. Sutter's account of the ATEU civilianization is "a misrepresentation," noting that several officers received overtime from the ATEU from 2011 to 2016.  Robinson Decl. ¶ 31.  Importantly, Ms. Sutter only stated that no sworn officers were employed within the ATEU *on a full-time, permanent basis*; in fact, she specifically stated that, "[f]ollowing the civilianization of the ATEU, some sworn officers were detailed to the ATEU on a less-than-full-duty temporary basis."[2]  Sutter Decl. ¶¶ 3–4; *see also* Aff. of Lamont Hinton ("Hinton Decl.") ¶¶ 3–4, ECF No. 27-1.  Regardless, both sides agree that, by 2014, MPD employed civilian technicians to operate automated traffic devices.  Sutter Decl. ¶¶ 3–4; Robinson Decl. ¶ 17.  Notably, no witness has stated that the ATEU continued employing officers on a full-time basis after 2011.  *See* Robinson Decl. ¶ 17 (quoting MPD regulations as stating that the ATEU program uses "'sworn MPD members' who 'receive compensation . . . outside of their regular assigned duties and responsibilities'" (ellipses in original)).

---

[2] Notably, even the handful of part-time assignments remaining in the ATEU would not have been suitable for Mr. Robinson.  In her deposition, Michelle Molotsky, deputy program manager for the ATEU, stated that four officers were still detailed to the ATEU to process tickets at the time of her deposition.  *See* Dep. of Michelle Molotsky ("Molotsky Dep.") at 4, 65–66.  Plaintiff does not cite to this deposition or otherwise argue that the part-time detail of these four officers demonstrates that the unit was not fully civilianized, presumably because processing tickets—which the Court understands to be a clerical exercise, *see Lehtinen v. Town of Greenport*, 2014 WL 3477037, at *5 (N.D.N.Y. July 11, 2014)—has nothing to do with the responsibilities that Plaintiff had when he was assigned, on a full-time basis, to the ATEU.  When Mr. Robinson was assigned to the ATEU, his responsibilities included instructing classes, drafting regulations, and otherwise supervising participants in the program.  *See* Robinson Decl. ¶¶ 12–15; Robinson Charge of Discrimination at 2, 4, ECF No. 24-15.  There is no dispute of facts that a full-time detail in the ATEU—let alone one like the one Mr. Robinson held and subsequently requested reassignment to—did not exist after 2011, and nothing in the record suggests that Mr. Robinson requested a part-time assignment processing tickets.  *See* Robinson Decl. ¶ 17; Sutter Decl. ¶¶ 3–4; Hinton Decl. ¶¶ 3–4.  Thus, notwithstanding the four officers assigned to the ATEU to process tickets on a part-time basis, *see* Sutter Decl. ¶¶ 3–4, the universe of assignments that Mr. Robinson could have continued to occupy—and to which he could have been reassigned per his requests—ceased to exist after 2011.

4

### B. The Transfer of Mr. Robinson

In 2011, following the start of MPD's civilianization of the ATEU, MPD reassigned Mr. Robinson to MPD's Special Events Branch. *See* Robinson Decl. ¶ 18; Sutter Decl. ¶¶ 2–3. Mr. Robinson's supervisors—Ms. Sutter and Commander Sund—told him that he was transferred as part of the civilianization process. Robinson Decl. ¶ 18. Mr. Robinson believes that he was transferred out and repeatedly denied reassignment back because of his race. Robinson Decl. ¶¶ 34–35.

Mr. Robinson was also denied overtime work in the ATEU. Although he did not participate in the lottery described above, he was a certified operator and instructor, and thus, according to him, qualified to work in the ATEU Overtime Program. Robinson Decl. ¶ 18. He requested overtime work starting on February 8, 2014 until the program ended on May 16, 2015, but his requests were denied each time by Ms. Sutter and Commander Sund. Robinson Decl. ¶ 18; Sutter Decl. ¶ 6; *see also* Dep. of Mark E. Robinson ("Robinson Dep.") at 31, ECF No. 19-1. His supervisors' stated reason for denying his request was that he did not meet the requirements for participation in the program, including the requirement to deploy radar car within the last six months. Robinson Dep. at 20–21. At one point, MPD also suggested that he was denied overtime opportunities because he did not participate in the 2010 lottery. Robinson Decl. ¶ 23. Mr. Robinson does not contend that he completed the usual prerequisites, instead arguing that they were only required for newly trained employees. Robinson Dep. at 21. Despite his claim that he was denied overtime in the ATEU, he did earn over 525 hours of overtime elsewhere in MPD from February 8, 2014 through May 16, 2016. Aff. of Priya Mathews ("Mathews Decl.") ¶ 6, ECF No. 19-2. In comparison, the average number of overtime hours received by officers participating in the ATEU Overtime Program was 468 during that

same period. Mathews Decl. ¶ 4. Mr. Robinson states that, had he been allowed to work overtime in the ATEU, he would have worked many more hours than the 525 hours he already worked, citing his history of working 1,500 to 2,000 hours of overtime per year. Robinson Decl. ¶¶ 29–30.

In support of his contention that he was transferred out of ATEU and denied overtime opportunities because of his race, Mr. Robinson points to situations where he believes less-qualified white employees were given opportunities ahead of him in the ATEU. According to Mr. Robinson, Terry Thorne—who is white—was selected to teach a photo radar class in the ATEU over Mr. Robinson in 2014, despite the fact that Mr. Thorne was less qualified. Robinson Decl. ¶ 26. In fact, all of Mr. Thorne's trainees were ultimately denied certification "because a problem was identified with respect to [Mr.] Thorne's qualifications." Robinson Decl. ¶ 26. Mr. Robinson also stated that Keith Blakely, who is white, was allowed to work in the ATEU Overtime Program despite not having participated in the lottery or used ATEU equipment in many years. Robinson Decl. ¶ 25. According to Mr. Robinson, Mr. Blakely was in the exact same situation he was with respect to the purported prerequisites to earning overtime, but Mr. Blakely did not have as much experience with the latest speed-detection equipment. Robinson Decl. ¶ 25. More broadly, Mr. Robinson contends that he is "more qualified to work in the ATEU overtime program than all of the white sworn members who earned overtime wages . . . because [he is] a certified instructor," and there were no certified instructors above him and one of his colleagues. Robinson Decl. ¶ 27. In fact, Mr. Robinson, along with only one other person, trained and certified all of the sworn officers who participated in the ATEU program. Robinson Decl. ¶ 27.

Mr. Robinson also states more generally that he "perceived [that] Ms. Sutter . . . discriminate[d] against [him] based on [his] race." Robinson Decl. ¶ 24. In support of this contention, he states that Ms. Sutter "was always more responsive to the white members and technicians" than she was to him. Robinson Decl. ¶ 34. He alleges that Ms. Sutter and Commander Sund knew about his complaints of discrimination when they rejected his requests for overtime. Robinson Decl. ¶ 36.

## III. LEGAL STANDARD

The Court must grant summary judgment to a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "view[s] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in [his] favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

A party opposing summary judgment generally cannot rest on his pleadings. *See* Fed. R. Civ. P. 56(e). After the moving party comes forward with proof of the absence of a genuine issue of material fact, the nonmoving party bears the burden of showing that there is such a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party must cite to materials other than the pleadings themselves, show that the moving party's materials are

7

insufficient, or show that its claims could not be supported by admissible evidence at trial. *See id.* at 324; Fed. R. Civ. P. 56(c).

Under Title VII of the Civil Rights Act of 1964, "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Direct evidence of discrimination or retaliation generally entitles the plaintiff to a jury trial. *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011); *see also Telesford v. Md. Provo-I Med. Servs., P.C.*, 204 F. Supp. 3d 120, 128 (D.D.C. 2016). In the absence of direct evidence of discrimination or retaliation, such claims are usually analyzed under the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Clipper v. Billington*, 414 F. Supp. 2d 16, 21, 25 (D.D.C. 2006); *see also George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005).

The first step of the *McDonnell Douglas* framework requires the plaintiff to make out a prima facie case of disparate treatment. In the case of discrimination, this requires the plaintiff to show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) "the unfavorable action gives rise to an inference of discrimination." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 180–81 (D.D.C. 2016), *reconsideration denied*, 185 F. Supp. 3d 135 (D.D.C. 2016); *see also Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004) (noting that the D.C. Circuit has "articulated an alternative formulation" of the *McDonnell Douglas* test for claims "that extend beyond . . . typical 'failure-to-hire' situations"). For retaliation claims, the plaintiff must show that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) his engagement in the protected activity caused the adverse employment action. *Achagzai*, 170 F. Supp. 3d at 185. The phrase "adverse

employment action" has a broader meaning in retaliation cases than it does in discrimination cases. *Id.*

Under the *McDonnell Douglas* formulation, once the employee establishes a prima facie case, the burden shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the adverse employee action." *Id.* at 181 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). If the employer succeeds in doing so, the burden shifts back to the employee to show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *George*, 407 F.3d at 411 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)).

However, in disparate-treatment discrimination and retaliation cases where there is no dispute that the plaintiff experienced an adverse employment action and the employer proffers a valid, nondiscriminatory (or nonretaliatory) basis for that action, courts shortcut the *McDonnell Douglas* framework. In such as case, the court asks only whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee on the basis of race, color, religion, sex, or national origin," or the employee's engagement in protected activity. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (adopting *Brady*'s formulation in a retaliation case).

In addition to applying to Title VII claims, the *McDonnell Douglas*/*Brady* formulation applies to claims brought under the District of Columbia Human Rights Act ("DCHRA"). *Bryant v. District of Columbia*, 102 A.3d 264, 267 (D.C. 2014) (citing Cain v. Reinoso, 43 A.3d 302, 306 (D.C. 2012)); *accord Rush v. Fed. Nat'l Mortg. Ass'n*, 208 F. Supp. 3d 1, 14 n.11

(D.D.C. 2016); *see also Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008). Thus, the Court's analysis concerning Title VII applies equally to Mr. Robinson's DCHRA claims.

IV. ANALYSIS

MPD argues that Mr. Robinson does not establish a prima facie case of discrimination because he fails to show that he was subjected to an adverse employment action, and that he has not rebutted MPD's non-discriminatory and non-retaliatory reason for his reassignment from the ATEU.[3] In support of its first argument, MPD contends that neither a lateral transfer from the ATEU nor the loss of overtime—the adverse actions alleged by Mr. Robinson, *see* Compl. ¶¶ 5, 17, ECF No. 1-3—constitute adverse employment actions. *See* Def.'s Mot. Summ. J. at 8–10, ECF No. 19.[4] In support of its second argument, MPD argues that Mr. Robinson has failed to show that its reasons for not transferring him to ATEU were pretextual because he never showed that, after the civilianization process, any sworn officer was reassigned to the ATEU on a permanent basis. Def.'s Mot. Summ. J. at 12–13. The Court begins its analysis with Mr. Robinson's transfer from the ATEU program, then proceeds to his claim that he has been denied overtime opportunities because of his race.

---

[3] Notably, Defendant does not move for summary judgment on the grounds that Mr. Robinson failed to rebut the nondiscriminatory reason MPD has provided for its refusal to allow him to participate in the ATEU Overtime Program. *See* Def.'s Mot. Summ. J. ¶ 2, ECF No. 19 (claiming that Defendant "has satisfied its burden to show that it had a legitimate, nondiscriminatory reason for denying Plaintiff's request to be reassigned to the [ATEU]," without mentioning the ATEU Overtime Program); Def.'s Mot. Summ. J. at 11. In fact, MPD has not directly asserted any non-discriminatory/non-retaliatory reasons for denying Defendant's request for overtime opportunities in the ATEU.

[4] Because Defendant did not include page numbers in its motion for summary judgment and accompanying memorandum of points and authorities, the Court cites to the numbers generated by ECF in referring to both documents.

## A. Mr. Robinson's Transfer from the ATEU

MPD argues that Mr. Robinson's claim of discriminatory transfer is faulty in two respects. First, it claims that a lateral transfer within MPD does not constitute an adverse employment action. Second, MPD argues that it had a nondiscriminatory reason for doing so, which Mr. Robinson has not rebutted—the civilianization of the ATEU. Because the Court holds that Mr. Robinson has not rebutted MPD's nondiscriminatory reason for his transfer, it does not address whether the transfer itself was an adverse employment action. *See Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 45 (D.D.C. 2009) (assuming without deciding that early termination from a temporary position is an adverse employment action, then proceeding to step two of *McDonnell Douglas*).

As noted above, under *McDonnell Douglas*, once a plaintiff establishes a prima facie case of discrimination or retaliation, the burden shifts to the defendant to articulate a nondiscriminatory basis for the adverse action taken against the employee. *Achagzai*, 170 F. Supp. 3d at 181. If the employer is able to show such a reason, the plaintiff then has the opportunity to show that the nondiscriminatory action was mere pretext for discrimination. *George*, 407 F.3d at 411. He can do this by showing, for example, that he had "stark[ly] superior[] . . . credentials" to the employee chosen at his expense. *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 193 (D.D.C. 2014) (quoting *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010)).

Assuming without deciding that Mr. Robinson's transfer from the ATEU (or denial of his requests to transfer back to the ATEU) could constitute an adverse employment action, MPD has articulated a nondiscriminatory basis for the reassignment and subsequent denials to transfer back to the ATEU. MPD transferred Mr. Robinson from his full-time detail at the ATEU— along with all other sworn officers—when the unit was civilianized in 2011. Robinson Decl.

11

¶ 18. As shown by Ms. Sutter's declaration, after the ATEU was civilianized, no sworn officers were detailed to the ATEU on a full-time basis. Sutter Decl. ¶¶ 2–3. Although there were officers who worked in the ATEU on a "less-than-full-duty temporary basis," those officers either held part-time assignments that were not comparable to Mr. Robinson's full-time detail, *see supra* note 2, or did so in the context of the ATEU Overtime Program, which is addressed by the Court in Section B below. *See* Sutter Decl. ¶¶ 4–5; *see also* Pl.'s Mem. Supp. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n) at 7, ECF No. 24 (disputing the concept of civilianization because "MPD continued to operate the ATEU . . . as an overtime program utilizing sworn members of MPD"); Pl.'s Opp'n Ex. 3, MPD Gen. Order 303.10 at 2, ECF No. 24-3 ("The ATE Program utilizes sworn [MPD] members who have been certified . . . . These members receive compensation for a duty assignment that it outside of their regular assigned duties and responsibilities . . . ."); Robinson Decl. ¶ 31 (taking issue with Ms. Sutter's declaration because sworn officers earned ATEU overtime). Mr. Robinson has failed to show that this reason is pretextual and the real reason was discrimination based on his race or retaliation based on his previous complaints about discrimination.

    Mr. Robinson attempts to show that MPD's characterization of the civilianization is incorrect by noting that several officers received overtime from the ATEU from 2011 to 2016, *see* Robinson Decl. ¶ 31, but his reasoning does not pertain to the portion of the complaint MPD seeks to have dismissed. Defendant's argument applies only to Mr. Robinson's claim that he was reassigned to MPD's Special Events Branch, not to his claim for loss of overtime. *See* Def.'s Mot. Summ. J. ¶ 2, 11. In fact, in failing to directly address the transfer claim in his opposition, Mr. Robinson appears to have implicitly abandoned it. Because Mr. Robinson has not shown that other officers remained detailed to the ATEU on a full-time basis—or that the

civilianization of the ATEU was otherwise pretextual—the Court will dismiss Mr. Robinson's claims of retaliation and discrimination insofar as they seek recovery for his reassignment from the ATEU to the Special Events Branch or his subsequent requests to be transferred back to the ATEU. The Court now proceeds to address the issue that seems to be at the core of this case—the allegedly discriminatory denials of his request for overtime in the ATEU.

### B. The Denial of Overtime in the ATEU

Mr. Robinson also claims that he suffered discrimination and retaliation when his requests for overtime within the ATEU were denied. Compl. ¶ 5. MPD argues that, under the circumstances here, the mere denial of overtime does not constitute an adverse employment action. *See* Def.'s Mot. Summ. J. at 9–10. But MPD's argument comes up short.

The standards for establishing adverse employment actions in discrimination cases and retaliation cases are not identical. *Jones v. Castro*, 168 F. Supp. 3d 169, 178 (D.D.C. 2016). In discrimination cases, "[a]n adverse employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Jones*, 168 F. Supp. 3d at 174 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). In contrast, "[f]or employment actions that do not obviously result in a significant change in employment status[,] such as giving a poor performance evaluation, reassigning office space and equipment . . .[,] an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm." *Id.* at 178 (quoting *Douglas*, 559 F.3d at 553).

A retaliatory employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation

omitted); *see also Segal v. Harris Teeter Supermarkets, Inc.*, No. 15-cv-1496, 2016 WL 7223273, at *7 (D.D.C. Dec. 13, 2016). But "not everything that makes an employee unhappy is an actionable adverse action"—"petty slights" and "minor annoyances" are not actionable under Title VII's retaliation provisions. *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); and then quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

In limited circumstances, "a lost opportunity to earn overtime pay may amount to an adverse employment action." *Caul v. U.S. Capitol Police*, No. 15-cv-1243 (BAH), 2016 WL 2962194, at *10 (D.D.C. May 19, 2016). Although overtime comes with "a tangible monetary advantage," it "is not universally regarded as desirable." *Id.* at *9. Indeed, requiring an employee to work paid overtime when he does not want to can constitute an adverse employment action. *See Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 77–78 (D.D.C. 2002). Thus, determining whether the loss of overtime constitutes an adverse employment action is a fact-specific inquiry. *Caul*, 2016 WL 2962194, at *10. In part because it shows that the employer viewed overtime opportunities favorably, "a lost opportunity for overtime . . . is only an adverse employment action where the trier of fact could reasonably conclude that plaintiff in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities." *Bell v. Gonzales*, 398 F. Supp. 2d 78, 97 (D.D.C. 2005). Additionally, the plaintiff must show that the loss of overtime fundamentally altered the terms, conditions, or privileges of the plaintiff's employment. *See id.* (citing *Dickerson*, 238 F. Supp. 2d 66, 76–77). Taken together, "[a]lleged denials of overtime opportunities may suffice to support a discrimination or retaliation claim when those denials are associated with a fundamental alteration in the conditions of employment . . . and the plaintiff demonstrates that

'[he] in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities.'" *Caul*, 2016 WL 2962194, at *9 (quoting *Sims v. District of Columbia*, 33 F. Supp. 3d 1, 7 (D.D.C. 2014)).

A reasonable juror could find that the consistent denial of Mr. Robinson's requests for overtime in the ATEU constituted discriminatory and retaliatory adverse employment actions. Mr. Robinson repeatedly requested that he be allowed to work overtime in the ATEU. *See* Robinson Decl. ¶ 18; Sutter Decl. ¶ 6; *see also* Robinson Dep. at 31. MPD does not dispute this claim. Thus, a jury could reasonably find that he sought overtime opportunities and that his employers were aware of his desire to work overtime. *See Bell*, 398 F. Supp. 2d at 97. Additionally, given Mr. Robinson's unrebutted claim that he had a history of working 1,500 to 2,000 hours of overtime annually—compared to the 525 he worked when he was reassigned—a reasonable jury could also find that the denials of his requests fundamentally altered the nature and privileges of his employment.[5] *See* Robinson Decl. ¶¶ 29–30; *Caul*, 2016 WL 2962194, at *9. By the same logic, a reasonable jury could find that the loss of up to 1,500 hours of overtime

---

[5] MPD notes that 525 hours of overtime is actually more than the average number of overtime hours logged by sworn officers in the ATEU Overtime Program during the time period at issue. *See* Def.'s Mot. Summ. J. at 10; Mathews Decl. ¶ 4. As a result, MPD argues, Mr. Robinson cannot show that he suffered a tangible harm. *See* Def.'s Mot. Summ. J. But Mr. Robinson responds that he suffered tangible harm regardless of the average number of overtime hours in the unit, because the denial of his requests for overtime deprived *him* of pay for *his* usual 1,500–2,000 hours of overtime *he* logged per year while in the ATEU program. *See* Robinson Decl. ¶ 30. The fact that officers in the ATEU logged, on average, less than Mr. Robinson, is irrelevant to whether he suffered a tangible harm. Moreover, Defendant's own exhibit shows that Mr. Robinson's expectation that he could have logged that many hours may be reasonable; several officers logged over 1,000 hours in the ATEU program, with one logging over 1,950 hours. *See* Mathews Decl. at 4–10. Thus, whether Mr. Robinson suffered an adverse employment action and/or a materially adverse employment action is a question for the finder of fact. *See Ortiz-Diaz v. United States Dep't of Hous. & Urban Dev.*, 831 F.3d 488, 492 n.6 (D.C. Cir. 2016).

pay[6] "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (internal quotation marks omitted).

Thus, under *Caul*, a reasonable juror could find that Mr. Robinson suffered a discriminatory and retaliatory adverse employment action. Mr. Robinson's supervisors knew that he wanted to work overtime but did not allow him to do so. A jury could reasonably find that MPD's decision significantly changed the nature of Mr. Robinson's employment, because he lost the benefits—financial, professional, and otherwise—that come along with working in the ATEU Overtime Program. *See Caul*, 2016 WL 2962194, at *9; *Jones*, 168 F. Supp. 3d at 174. Moreover, MPD has not endeavored to justify these denials based on non-discriminatory/non-retaliatory reasons. As a result, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's claim that he was discriminatorily and retaliatorily denied overtime opportunities in the ATEU.

---

[6] As Plaintiff points out, the undisputed evidence shows that he would have been able to earn $76 per hour in the ATEU had he been able to work overtime. Robinson Decl. ¶ 30. Based on the number of hours that he would have worked, Mr. Robinson's assertion that he could have made $80,000 more per year had he been allowed to work overtime in the ATEU is reasonable. *See* Robinson Dep. at 43. Courts in this circuit have found far smaller decreases in income actionable under Title VII. *See Ginger v. District of Columbia*, 527 F.3d 1340, 1343–44 (D.C. Cir. 2008) (holding that "[a] nontrivial loss of pay is 'an objectively tangible harm'"); *Russell v. Principi*, 257 F.3d 815, 818–19 (D.C. Cir. 2001) (holding that a performance evaluation that resulted in "loss of a bonus that is worth hundreds of dollars" was an adverse employment action); *Walker v. Johnson*, No. 11-cv-816, 2013 WL 12061037, at *7 (D.D.C. Dec. 20, 2013) (suggesting that the loss of two days' pay could constitute a "nontrivial loss of pay," which would be an adverse employment action), *aff'd*, 798 F.3d 1085 (D.C. Cir. 2015).

## V.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 1, 2017                                          RUDOLPH CONTRERAS
                                                                United States District Judge